# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHELLE H.,             )
                         )
           Plaintiff,    )
                         )
    v.                   )       1:23CV159
                         )
MARTIN J. O'MALLEY,    )
Commissioner of Social   )
Security,               )
                         )
           Defendant.[1]  )

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Michelle H., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 3.) The Commissioner has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 11 (Plaintiff's Brief); Docket Entry 12 (Commissioner's

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Brief)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 422-31), alleging a disability onset date of January 12, 2018 (see Tr. 422, 425).  Upon denial of that application initially (Tr. 298-316, 351-59) and on reconsideration (Tr. 317-42, 361-68), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 369-70).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 262-97.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 235-61.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 5-11, 418-21, 538-42), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.  [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2023.

2.  [Plaintiff] has not engaged in substantial gainful activity since January 12, 2018, the alleged onset date.

. . .

_____

[2] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge [] to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings therein." (Docket Entry 10 at 1.)

3.    [Plaintiff] has the following severe impairments: anxiety, depression, obesity, osteoarthritis, degenerative disc disease, and degenerative joint disease.

. . .

4.    [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.    . . . [Plaintiff] has the residual functional capacity to perform light work . . . except [she] can perform simple and routine repetitive tasks at a non production pace rate in a low stress work environment with no more than occasional changes in workplace procedures and settings and no more than occasional uses of judgement or decision-making capabilities. She can have occasional interaction with co-workers and supervisors, but can never have interaction with the general public. [She] can sit for 6[]hours out of an 8-hour day. She can stand and walk for 4 hours out of an 8-hour workday. She can stand and walk for no more than one hour at a time, which needs to be followed by 15 minutes of sitting (this does not represent a break, but a change in position from standing or walking to sitting after standing or walking for one hour at a time). She can frequently climb ramps and stairs and occasionally climb ladders, ropes, poles, and scaffolding. [She] can frequently balance and stoop, but can only occasionally kneel, crouch, and crawl. She must avoid concentrated exposure to workplace hazards, such as unprotected heights and moving machine parts.

. . .

6.    [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

3

. . .

    11. [Plaintiff] has not been under a disability, as
    defined in the . . . Act, from January 12, 2018, through
    the date of this decision.

(Tr. 241-56 (bold font and internal parenthetical citations
omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of . . . review of [such a] decision . . . is extremely limited."
Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has
not established entitlement to relief under the extremely limited
review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a
reviewing court must uphold the factual findings of the ALJ
[underlying the denial of benefits] if they are supported by
substantial evidence and were reached through application of the
correct legal standard." Hines, 453 F.3d at 561 (internal brackets
and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting

4

Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]."  Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)."  Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

5

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174

_____

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

6

F.3d 473, 475 n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled. Id. at 179-80.  However, if the

---

[4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignment of Error

In Plaintiff's first and only issue on review, she argues that "[t]he ALJ erred by failing to properly consider Plaintiff's subjective statements in light of the progressive nature of her condition." (Docket Entry 11 at 5 (bold font and block formatting omitted).) More specifically, Plaintiff contends that "[t]he ALJ routinely notes where he finds [Plaintiff]'s statements to be 'inconsistent' with other statements or with other part [sic] of the record," but maintains that "th[o]se 'inconsistencies' generally do not appear to be actual inconsistencies within the record." (Id. at 7.) In particular, Plaintiff challenges the

_____

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

ALJ's finding of inconsistencies between 1) the Function Reports of Plaintiff and her husband regarding how frequently she goes outside (see id. at 7-8 (citing Tr. 245, 482, 490-91), 2) Plaintiff's "description of how she spends her day" in a Function Report and the activities she described in that same Report (id. at 8 (citing Tr. 245, 284, 481, 506-07)), 3) a notation in a July 2018 treatment note that Plaintiff "plann[ed] to go to the beach" and "her allegations of rarely leaving the house" (id. (citing Tr. 248, 276, 281, 1372, 1711-12)), 4) Plaintiff's September 2018 trip to a lake to care for her grandchildren and her allegations of spending most of her time at home and not providing care for anyone (id. at 9 (citing Tr. 248-49, 480, 719)), and 5) Plaintiff's statement that she drove 85 miles for a job in July 2018 and Plaintiff's other statements reflecting greater limitations on her ability to drive (id. (citing Tr. 249, 276-77, 482, 502, 508, 520)).  According to Plaintiff, "the ALJ repeatedly ignore[d Plaintiff]'s testimony and statements about the progression of her impairments and continually cite[d] to events that happened **before** her conditions deteriorated as 'inconsistencies' with [her] description of her current functioning **after** her condition deteriorated," which amounts to "what the [United States Court of Appeals for the] Fourth Circuit has described as 'dredg[ing] up specious inconsistencies.'" (Id. at 10 (quoting Kounce v. Apfel, No. 98-1144, 166 F.3d 1209 (table), 1999 WL 7864, at *2 (4th Cir. Jan. 11, 1999) (unpublished)).)

9

In Plaintiff's view, the ALJ's "error is harmful because the ALJ is charged with determining whether [Plaintiff] was disabled for any consecutive twelve-month period between the alleged onset date and the hearing date" (id. (citing Sykes v. Commissioner of Soc. Sec., Civ. No. 16-898, 2017 WL 35436, at *2 (D. Md. Jan. 4, 2017) (unpublished))), and, [t]hus, the ALJ should have considered that [Plaintiff]'s medical condition had gotten worse, as she stated, rather than negating her current statements with citations to events that occurred before her deterioration" (id.). Plaintiff further contends that, if the ALJ had "proper[ly] consider[ed Plaintiff's subjective] complaints, . . . [she] would have like been found disabled with a reduction in her RFC to the sedentary range of exertion." (Id. at 11 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.14).) For the reasons explained in more detail below, Plaintiff's contentions lack merit.

1. <u>Frequency of Going Outside</u>

Plaintiff first challenges the ALJ for "indicating that there is an inconsistency between [Plaintiff]'s [F]unction [R]eport and her husband's [T]hird-[P]arty [F]unction [R]eport," in that "the ALJ said, '[i]nconsistent with [Plaintiff]'s allegations she rarely went outside, her husband reported she went outside about once a day.'" (Id. at 7 (quoting Tr. 245).) According to Plaintiff, "this is not an inconsistency" because, "[i]n that same [T]hird-[P]arty [Function R]eport, [her] husband clarifie[d] that [Plaintiff] used to go outside more, but now she watches TV, talks

10

on the phone, and is on the internet all day," and "'rarely if ever goes out if she doesn't have an appointment.'" (Id. (quoting Tr. 491).) Plaintiff contends that the ALJ's alleged error in that regard holds "similar[ity] to the situation in *Shelley C. v. Commissioner of Soc. Sec.*, [61 F.4th 341 (4th Cir. 2023)], where the [United States Court of Appeals for the] Fourth Circuit faulted the ALJ for focusing on one portion of a note while overlooking the other evidence in the same entry." (Id. at 7-8 (citing Shelley C., 61 F.4th at 362).)

The ALJ did not err by pointing out the difference between Plaintiff's response, "[o]nly for appointments usually because I am scared of falling[ a]nd my depression makes me want to stay in a shell," to the question on the Function Report "[h]ow often do you go outside" (Tr. 482 (emphasis added)), and her husband's response "[a]bout once a day" to the same question (Tr. 490 (emphasis added)). (See Tr. 245.) Although Plaintiff's husband also indicated, in response to the Third-Party Function Report's request to "[l]ist the places [Plaintiff] goes on a regular basis[] ([f]or example, church, community center, sports events, social groups, etc.)" (Tr. 491 (emphasis added)), that Plaintiff "rarely if ever goes out if she doesn't have an appointment" (id. (emphasis added)), as the Commissioner notes, "one can go outside every day without going to a specific location such as church or a sporting event" (Docket Entry 12 at 17 (emphasis added)). The ALJ thus did

11

not err in highlighting the inconsistency between the answers of
Plaintiff and her husband to the same question on a Function
Report, which also distinguishes the ALJ's analysis from the
"cherry-picking" criticized by the Fourth Circuit in Shelley C.,
Shelley C., 61 F.4th at 362 (finding ALJ "inappropriately brushed
off [the plaintiff's] intentional overdose" by "not[ing]
that . . . she simply wanted to get a good night's sleep," and
"failed to mention [her] statement that an argument with her
husband led her to take the handful of pills which landed her in
the [emergency room]" (internal quotation marks omitted)).

2.  Daily Activities

Plaintiff next contests the ALJ's statement that
"[Plaintiff]'s description of how she spen[t] her day [wa]s
inconsistent with preparing meals on a weekly basis, performing
some household chores, and doing laundry three times a week."
(Docket Entry 11 at 8 (citing Tr. 245).)  Plaintiff deems it
"unclear how this [wa]s an inconsistency," because she "state[d] on
numerous occasions that she only prepare[d] simple meals about once
a week, that she use[d] a Swiffer for about 30 minutes once a week,
and that she d[id] laundry but not without difficulty, and,
"outside of th[o]se activities which occur[red] infrequently, she
[wa]s watching TV or on her phone."  (Id. (citing Tr. 284, 481,
506-07).)

12

Plaintiff's argument ignores the basis of the ALJ's inconsistency finding in question. The ALJ noted that "[Plaintiff] was <u>very vague</u> in describing what she d[id] during the day[, and] reported taking a shower using a shower chair and trying to move around the house with a walker." (Tr. 245 (emphasis added) (referencing Tr. 480); <u>see also</u> Tr. 480 (reflecting Plaintiff's statement that "[her] <u>normal routine</u> usually [wa]s to shower with a shower chair, because [she] ha[d] fallen several times," and to "try to move around the house but [she] used [her] walker since [she was] home alone" in response to Function Report's request to "[d]escribe what [she] d[id] from the time [she] w[o]ke up until going to bed" (emphasis added)).) Plaintiff's statement that her entire day "normal[ly]" or "usually" consisted of showering and moving around her house with a walker (Tr. 480) conflicted with her other statements that she watched TV every day (<u>see</u> Tr. 289, 483), talked on her phone a few hours a day (<u>see</u> <u>id.</u>), prepared meals weekly (<u>see</u> Tr. 481), visited with family weekly (<u>see</u> Tr. 483), and did her laundry three times a week (<u>see</u> Tr. 481), and, thus, the ALJ did not err in noting that inconsistency (<u>see</u> Tr. 245).

3. <u>Beach Trip in July 2018</u>

Plaintiff additionally takes issue with the ALJ's finding that Plaintiff's "plan[s] to go to the beach for the weekend" in July 2018 conflicted "with her allegations of rarely leaving the house." (Docket Entry 11 at 8 (citing Tr. 248).) Plaintiff asserts that no

13

inconsistency existed because, "[a]t that time, [Plaintiff] was hoping to return to work" (id. (citing Tr. 1372)), and that "[i]t was in [sic] January 18, 2019, that [her] panic attacks and episodes of anxiety began increasing" (id. (citing Tr. 1711-12)). Plaintiff points out that, "at her hearing, she further clarified that her anxiety had gotten worse over the course of the prior three years, meaning that her condition would have started deteriorating in the fall of 2018" (id. (citing Tr. 281)), and argues that her "attempts to return to work and vacation *in mid-2018*, before her psychological condition began to deteriorate, are not inconsistent with her description of her functioning *in 2020 and 2021*, after her psychological condition began deteriorating" (id. (emphasis in original)).

As an initial matter, Plaintiff's assertion that an inconsistency did not exist because she "was hoping to return to work" at the time of her July 2018 beach trip (id. (citing Tr. 1372)) misses the mark. Plaintiff testified that she lost her job with the North Carolina Department of Revenue ("NCDOR") in the first week of July 2018 because her employer replaced her while she remained out of work on a leave of absence occasioned by gastrointestinal symptoms. (See Tr. 272-73.) Plaintiff continued looking for work (see Tr. 488 (statement of Plaintiff's husband on Third-Party Function Report dated May 6, 2020, that Plaintiff applied for jobs on the computer)), and she, in fact, held three

14

different jobs (albeit briefly) in <u>mid to late 2019 and early 2020</u> (<u>see</u> Tr. 269-72), well after the time Plaintiff now claims that her condition began deteriorating on January 18, 2019 (<u>see</u> Docket Entry 11 at 8). Thus, the mere fact that Plaintiff still hoped to return to her job with the NCDOR at the time she took her beach trip in early July 2018 does not distinguish that time period from later periods when Plaintiff continued to look for and obtain jobs despite her complaints of disabling anxiety and panic attacks.

More significantly, Plaintiff has alleged her disability began on January 12, <u>2018</u> (<u>see</u> Tr. 422, 425), and she did not restrict her August 2021 hearing testimony that she rarely left the house (<u>see</u> Tr. 276), or her similar statements in Function Reports in May and December 2020 (<u>see</u> Tr. 482, 508), to only the period of time contemporaneous to those statements. In other words, Plaintiff could have made clear that, notwithstanding her alleged onset date of January 12, <u>2018</u>, she could take vacations until her mental condition "worsened" or "deteriorated" on January 18, <u>2019</u>, but did not do so.[7] Thus, the ALJ did not err in construing Plaintiff's

---

[7] As the Commissioner points out, "the record does not support Plaintiff's claims of [mental] deterioration." (Docket Entry 12 at 19.) Although Plaintiff testified at the hearing on August 31, 2021, that her "anxiety and depression started in around 2014, and . . . ha[d] significantly gotten worse, in the past . . . three years or so," i.e., at the end of August 2018 (Tr. 281), the ALJ pointed out that Plaintiff told her primary care provider on <u>May 3, 2018</u>, that "anxiety" described as "acute" and "sudden in onset" began <u>three months earlier in February 2018</u> (Tr. 248 (citing Tr. 1256-57)), well before the July 2018 beach trip at issue. The ALJ further noted that, although "[o]n January 18, 2019[, Plaintiff] reported having increased episodes of anxiety and panic attacks" (Tr. 248 (citing Tr. 1711)), later records from the same provider in March, July, and August 2019 did not reflect complaints of anxiety or panic attacks (<u>see</u> Tr. 248-49 (citing Tr. 1110, 1377, 1452)).

15

unqualified statements that she rarely left the house (see Tr. 276, 482, 508) as applying to the entire period before the ALJ, which began on January 12, 2018, and further did not err in noting the inconsistency between those statements and Plaintiff's beach trip in July 2018.

4. Lake Trip in September 2018

Plaintiff also challenges "the ALJ['s ] not[ation] that[,] 'inconsistent with her allegations,' [Plaintiff] went to the lake and took care of her grandchildren in September 2018." (Docket Entry 11 at 9 (quoting Tr. 248).) In Plaintiff's view, that lake trip took place "before the onset of [her] significant degenerative disease and bilateral knee pain in January 2020." (Id. (citing Tr. 249, 719) (stray comma omitted).) Plaintiff further notes that she stated on her May 2020 Function Report "that she 'watched' her grandchildren before her illness." (Id. (quoting Tr. 480).) Plaintiff contends that "this situation mirrors *Shelley C.*, where the ALJ erroneously focused on just a few experiences, such as the claimant's participation in water aerobics and taking an art class, which only appeared in a handful of treatment notes." (Id. n.3 (citing Shelley C., 61 F.4th at 261).)

Contrary to Plaintiff's assertion, her statement on the May 2020 Function Report that, "before [her] illness, [she] . . . watched her grandchildren" (Tr. 480) actually supports the ALJ's observation of an inconsistency. As noted above,

16

Plaintiff has alleged that her disability began on January 12, 2018 (see Tr. 422, 425), and thus, by her own statements, she claimed not to have watched her grandchildren after her disability began on January 12, 2018 (see Tr. 480). As such, the ALJ properly observed an inconsistency between her unqualified assertion "of spending most of her time in her bedroom at home and not providing care for anyone" and her trip to the lake in September 2018 "to take care of her grandchildren." (Tr. 248; see also id. (also noting that Plaintiff reported "tak[ing] care of her mother" at a July 18, 2018, visit with her primary care provider (citing Tr. 1410-12), 253 (further remarking that, at "consultative psychological evaluation on August 30, 2020, . . . [Plaintiff] admitted caring for her aging parents" (citing Tr. 1864) (emphasis added)).)

Moreover, as the ALJ discussed the inconsistency between Plaintiff's ability to travel to the lake and care for others and her assertion that she spent most of her time in her bedroom due to her depression and anxiety (see Tr. 276, 281, 283), the alleged worsening of her physical condition in 2020 does not undermine the validity of the ALJ's observation. Furthermore, unlike the ALJ in Shelley C., who found that the plaintiff "regularly" attended water aerobics when "those . . . activities were few and far between," Shelley C., 61 F.4th at 362, the ALJ here noted only that Plaintiff went to the lake in September 2018, and did not improperly portray

17

that trip as an activity in which Plaintiff participated regularly. (<u>See</u> Tr. 248.)

5.  <u>Driving 85 Miles to a Job in July 2018</u>

Lastly, Plaintiff criticizes the ALJ for finding Plaintiff's ability to "dr[i]ve 85 miles for a job in July 2018 . . . inconsistent with her statements about her ability to drive." (Docket Entry 11 at 9 (citing Tr. 248 (stray comma omitted).) In that regard, Plaintiff notes that she stated on both Function Reports "that she can only drive for short distances" (<u>id.</u> (citing Tr. 482, 508)), and on Disability Reports "that she can only ride in a car for about 30 minutes because she has extreme pain in her back caused by degenerative disc disease" (<u>id.</u> (citing Tr. 502, 520)). Plaintiff further points to her testimony "that she only stopped driving about two years prior to her hearing, which would have been in the fall of 2019" (<u>id.</u> (citing Tr. 276)), and "that her difficulties with sitting have been exacerbated by the loss of weight since her gastric bypass in late 2020" (<u>id.</u> (citing Tr. 276-77)).

Unlike Plaintiff's contentions regarding a mental deterioration in January 2019 (<u>id.</u> at 8 (citing Tr. 281)) which, as discussed above, the record did not bear out, the record does support Plaintiff's assertion that she reduced her driving beginning "in the fall of 2019" (<u>id.</u> at 9 (citing Tr. 276)). Although Plaintiff reported to her primary care provider in July

18

2018 that she drove 85 miles for her job (see Tr. 1410), she also reported that the driving resulted in her "feeling very overwhelmed with her job" (id.). Plaintiff further testified at the hearing that she went out on a leave of absence for colitis with that employer in January 2018 (see Tr. 272), and that, at the point she contemplated returning to work in July of 2018, her employer terminated her (see id.), "because they needed someone that [sic] could have been there and done the work" (Tr. 273). Notably, the ALJ did not point to any further instances of long-distance driving by Plaintiff in the record. (See Tr. 248-53.) Thus, as Plaintiff remained on a leave of absence from her alleged onset date in January 2018 to some time in July 2018, no inconsistency existed between Plaintiff's brief and "overwhelm[ing]" (Tr. 1410) experience driving 85 miles for her job in July 2018 and her later statements that she drove only "short distances" (Tr. 482, 508), that she did not drive outside of her home town (Tr. 276, 508), that she reduced her driving "about two years" prior to the hearing on August 31, 2021 (i.e., in approximately the fall of 2019) (Tr. 276), and that she could not "ride a long period of time [] because of issues with [her] back" (id.).

The ALJ's error in finding an inconsistency in Plaintiff's statements regarding the amount of driving she could perform, however, qualifies as harmless under the circumstances of this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir.

19

1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). In addition to noting the inconsistencies in Plaintiff's statements regarding her activities (beyond her driving) discussed above, the ALJ made the following other observations supporting his analysis of Plaintiff's subjective symptom reports:

- "[i]nconsistent with [Plaintiff's] allegations of treatment for C. Difficile" (Tr. 247 (referencing Tr. 272, 577, 1806)), "her treatment record disclosed her test results were negative for C. Difficile" (id. (referencing Tr. 793, 849));

- although "[o]n January 18, 2019[, Plaintiff] reported having increased episodes of anxiety and panic attacks" (Tr. 248 (citing Tr. 1711)), later records from the same provider in March, July, and August 2019 do not reflect complaints of anxiety or panic attacks (see Tr. 248-49 (citing Tr. 1110, 1377, 1452));

- "[i]nconsistent with [Plaintiff's] allegations of not cooking or shopping, treatment records from Novant [Health in June 2020] report [she] admitted she and her husband cooked and shopped for groceries" (Tr. 250 (citing Tr. 1901));

- "[w]hen seen at Novant Health in October 2020," Plaintiff "report[ed she] was doing more walking and had purchased several pieces of exercise equipment" (Tr. 251 (citing Tr. 2052)), and, "on November 19, 2020, . . . her examination disclosed she had a normal gait and normal range of motion in her extremities" (id. (citing Tr. 2035));

- "[i]nconsistent with [Plaintiff's] allegations of using an assistive device for ambulation, the records do not report she used or needed an

20

assistive device for walking or standing" (<u>id.</u> (citing Tr. 2007-11));

- "[w]hen seen at Novant Health on February 3, 2021[, Plaintiff] had lost 29 pounds and was doing well after being taken off parenteral nutrition" and "[h]er physical examination was normal, including normal range of motion in her extremities[] . . . [and] a normal gait" (Tr. 252 (citing Tr. 4025-29)); and

- "when seen on June 3, 2021, . . . [Plaintiff's] weight had dropped to 209 pounds[,] . . . she denied being in any pain," and "[h]er treatment records noted she did well post bariatric surgery and experienced improvement in her obesity related co-morbidities" (<u>id.</u> (citing Tr. 3969-70)).

As the ALJ's decision cites to substantial evidence supporting his finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (Tr. 246), Plaintiff has not shown reversible error arising out of the ALJ's errant finding of an inconsistency in Plaintiff's statements regarding her driving abilities. <u>See</u> <u>Krystal H. v. Saul</u>, No. 4:19CV5, 2020 WL 5526499, at *6 (W.D. Va. July 20, 2020) (unpublished) (deeming ALJ's error in "consider[ing] the type of daily activities [the plaintiff] could perform without explicitly considering her testimony describing the limited extent to which she could perform them . . . harmless . . . because the ALJ gave other legally adequate reasons to support his [subjective symptom] and RFC assessments, and those reasons [we]re supported by

21

substantial evidence in the record"), <u>recommendation adopted</u>, 2020 WL 6047756 (W.D. Va. Oct. 13, 2020) (unpublished).

In short, Plaintiff's first and only issue on review fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED**, and that this action is **DISMISSED** with prejudice.


                  /s/ L. Patrick Auld
                  **L. Patrick Auld**
        **United States Magistrate Judge**

March 25, 2024